Filed 4/27/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079771 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF066465 ) |
| KRISSY LYNN WERNTZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Riverside County, John D. Molloy, Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Randy Einhorn, and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Krissy Lynne Werntz sought resentencing under Penal Code[1] section 1172.6 (formerly section 1170.95).[2]  After holding an evidentiary hearing, the trial court denied the petition, finding that the prosecution proved beyond a reasonable doubt that Werntz committed murder by failing to protect her daughter.

Werntz contends there is insufficient evidence to support the court's findings.  She asks us to review the denial of her petition de novo because there was no live testimony, and she alternatively contends there was not substantial evidence to support the court's factual conclusions.  She also argues that the trial court's order cannot be affirmed based on a finding of aiding and abetting implied malice murder because such a theory is not valid under current law.

We conclude the proper standard of review is substantial evidence, and we find that substantial evidence supports the trial court's conclusion that Werntz failed to protect her child and is guilty of second degree murder.  In addition, we reject Werntz's contention that aiding and abetting implied malice murder no longer exists under California law.  We therefore affirm the order.

PROCEURAL AND FACTUAL BACKGROUND

On September 14, 2009, the Riverside County District Attorney filed an indictment charging Werntz, in count 2, with the second degree murder of

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     Assembly Bill No. 200 (Stats. 2022, ch. 58, § 10) renumbered section 1170.95 to 1172.6, effective June 30, 2022.

Montana H., in violation of section 187, subdivision (a).[3]  On April 8, 2014, a jury found Werntz guilty as charged.  The court sentenced Werntz to prison for a term of 15 years to life.

Werntz appealed, and we affirmed her conviction in an unpublished opinion filed February 3, 2016.  (*People v. Werntz* (Feb. 3, 2016, D069075).)

On January 11, 2019, Werntz filed a form petition for resentencing under section 1172.6.  The court appointed counsel and received briefing. The court thereafter found Werntz had not stated a prima facie case for relief and summarily denied the petition.

Werntz appealed the denial of her petition, and this court reversed the applicable order in an unpublished opinion filed on March 11, 2021. (*People v. Werntz* (Mar. 11, 2021, D077845).)

After remand, the trial court issued an order to show cause.  On November 23, 2021, the trial court held an evidentiary hearing.  At that hearing, the court detailed the trial testimony it had reviewed, including going through the various witnesses at trial.  The court also stated that it read both our opinions in *People v. Werntz, supra*, D069075 and *People v. Werntz, supra*, D077845.  The court then allowed the parties to argue the matter.

---

[3]    Additionally, the indictment charged Werntz's husband, Jason Hann, with premeditated murder (§ 187, subd. (a); count 1) and child endangerment under circumstances likely to produce great bodily harm (§ 273ab, subd. (a); count 3).  On November 12, 2013, Werntz's case was severed from Hann's, and the two proceeded to trial separately.  A jury convicted Hann of the two charges on December 17, 2013.

Werntz's counsel argued that the jury had convicted Werntz of murder with implied malice for failing to protect her child.[4]  However, counsel noted that the evidence at trial did not establish that Werntz knew that Hann was abusing the child.  For example, at trial, the prosecution had offered evidence of injuries to Werntz's other children, arguing that Werntz must have known Hann was abusing them, but defense counsel insisted the victims' respective injuries did not prove that there were any visible bruises.  Counsel emphasized that "[t]he trial transcript is void of any type of direct evidence of notice.  It's all done essentially by implication.  She had to have known that it's, kind of, the underlying argument that prevails throughout the testimony, but without actual evidence, if she didn't.  In fact their own experts were coming up and saying the types of injuries that you see on these poor kids were not the kind that you would even notice.  They were not detecting.  There was really nothing of that sort that's laid out anywhere in the testimony."

The prosecutor responded by contending that Werntz's participation in hiding the skeletal remains of the two babies is what prevented the medical experts from seeing more conclusive evidence of the injuries.  The prosecutor pointed out that Werntz changed her story regarding Jason's death, claiming, on one occasion, that he died of a spider bite while, on another occasion, stating he died of crib death.  Moreover, Werntz and Hann took Jason's corpse with them as they traveled across the country.

---

[4]     Werntz had three children:  Jason, Montana, and Michael.  Evidence adduced at trial pointed to all three children being victims of abuse with Jason and Montana's injuries resulting in their respective deaths.  In the instant action, Werntz only was charged and convicted of murdering Montana.

The prosecutor further noted that there was evidence that Werntz and Montana were "inseparable"; thus, it would not be probable that Werntz would not have been aware of Montana's injuries. And the prosecutor maintained that the evidence established Montana's leg was broken three or four weeks before her death. Moreover, that type of fracture would lead to "swelling, redness, puffiness, and would have been incredibly painful." Also, Montana had an ankle injury "with periosteal thickening," indicating that the injury was healing.

The prosecutor detailed Montana's head injury, observing that her head was wrapped in duct tape "to stop the blood and brains from seeping out of the [skull] factures." Additionally, the prosecutor discussed Werntz's lack of concern or shock at discovering Montana was dead.

Finally, the prosecutor reviewed the evidence of Michael's injuries, arguing that his injuries were noticeable and he "was visibly not doing well." This evidence coupled with the death and injuries to Jason and Montana, lead the prosecutor to argue: "So for Ms. Werntz to try and take the position that she did not know what was going on is the kindest word I can use is disingenuous." The prosecutor further emphasized:

> "She, at one point, said to Investigator LeClair, How can I know what's going on with my baby when you haven't shown me an autopsy? How can law enforcement show her an autopsy when she keeps hiding the babies in trash bags, and that is consciousness of guilt to confront the investigator and tell him that he's not giving her the information that she obviously knows she's hidden from law enforcement."

The prosecutor's argument at the hearing buttressed the contention in the prosecutor's written opposition to Werntz's petition for resentencing that Werntz was guilty of murder as an aider and abettor with implied malice because she violated her legal duty to protect Montana despite knowing that

5

Hann was abusing their daughter. And the prosecutor pointed out that the jury was instructed under CALCRIM No. 400A (Parent's Duty to Protect Child), CALCRIM No. 401 (Aiding and Abetting: Intended Crime), and CALCRIM No. 520 (Second Degree Murder with Malice Aforethought).

After the prosecutor concluded, the court noted that it was required to find that Werntz "is either guilty beyond a reasonable doubt or not guilty." The court then allowed Werntz's counsel to respond to the prosecutor's argument. He emphasized that it was speculation that Werntz knew anything about Hann's abuse of either Jason or Montana before their deaths.

The trial court then stated that this appellate court "did an excellent job of summarizing the germane facts of this case." It then read the statement of facts from *People v. Werntz*, *supra*, D069075, into the record. As such, we repeat that factual background as follows:

"The badly decomposed remains of 10-week-old Montana were found in February 2002 after being abandoned in a storage facility in Arkansas four months earlier. This discovery led police on a nationwide search for Montana's parents, and led to the discovery of the badly decomposed remains of six-week-old Jason, whose remains had earlier been abandoned in a storage facility in Arizona in December 2000. When police arrested [Werntz] and Hann at a motel in Maine, Hann was holding one-month-old Michael, who had been severely beaten at least twice.

"This appeal involves only [Werntz]'s conviction for murdering Montana. However, because evidence regarding Jason's death and Michael's abuse figured prominently in that conviction, we will present that evidence in some detail. Although Montana is the only subject of [Werntz]'s prosecution and her remains were discovered first, we begin our factual summary with the evidence regarding Jason because he was murdered first.

6

*"Jason*

"Jason was born in Ohio [i]n May . . . 1999.  He died in Vermont on July 4, 1999 (though his remains would not be discovered until April 23, 2002).  [Werntz] and Hann initially kept Jason's remains in a plastic container in the back seat of their car as they traveled the country.

"In September 2000, Hann and [Werntz], who was pregnant, stayed in a pop-up trailer at a campground in New Hampshire.  They befriended Jean and Walter S[.], who were staying at the neighboring campsite as they moved from New Hampshire to Florida.  They became close—'like family'—and ate dinner and sat around the campfire together almost every night.  Hann did most of the talking on his and [Werntz]'s behalf, but would look to [Werntz] and ask, 'Isn't that right, Krissy?'  During one conversation, Hann told the [S. Family] they had lost a son, Jason, who died from 'crib death.'  When Hann asked [Werntz], '[i]sn't that right,' she confirmed his statement.  ([Werntz] would later tell police she thought Jason might have died from a spider bite while they were living in a tent in Vermont.)  The [S. Family] left the campground in October 2000; [Werntz] and Hann left sometime thereafter.

"On December 9, 2000 (just over a week after Montana was born), Hann rented a storage unit in Lake Havasu, Arizona, where he would leave the pop-up trailer.  About 16 months later, on April 23, 2002 (the day after [Werntz] and Hann were arrested in connection with Montana's death, discussed below), Mohave County Sheriff's deputies searched the trailer pursuant to a warrant.  In a storage compartment beneath a bench in the trailer, deputies discovered Jason's decomposed remains inside a black nylon bag, which was wrapped in 17 plastic trash bags (with air fresheners placed in the ninth bag), all of which had been placed inside a plastic container.

7

Jason's birth certificate and other paperwork left in the trailer connected the trailer to [Werntz] and Hann.

"Because authorities determined Jason had died in Vermont, his remains were sent there so the state's chief medical examiner could perform an autopsy. Due to the decomposition of Jason's remains, the autopsy could not detect any soft-tissue injuries. However, the autopsy revealed Jason had suffered a fractured rib adjacent to his spinal column at or near the time of death. The location of the fracture indicated inflicted trauma rather than accidental injury and is 'characteristic of abuse in which the child has been grabbed about the chest and abdomen . . . and, with pressure, being squeezed on the back and the front. This can occur in . . . shaking kinds of injuries or in which an infant is picked up and thrown against something.' The medical examiner determined Jason's death was caused by 'homicide by undetermined means.'

"*Montana*

"Montana was born in Lake Havasu, Arizona [i]n December . . . 2000. Hann called the [S. Family] that day to tell them about Montana's birth and that they had named her Montana Jean after Jean S[.] A few weeks later, [Werntz] and Hann drove with Montana to Florida and stayed with the [S. Family] for two weeks over the Christmas Holiday, leaving New Year's Day. After [Werntz], Hann, and Montana left the [S. Family's] bound for California on January 1, 2001, Hann told the [S. Family] he would call when they arrived. Neither Hann nor [Werntz] ever called the [S. Family] again (even after Montana's death).

"Montana died about six weeks later, on February 10, 2001, in Desert Hot Springs, California (though her remains would not be discovered until

8

February 18, 2002).  [Werntz] and Hann kept Montana's remains in a plastic bag under the bed in their trailer.

"On October 16, 2001, [Werntz] and Hann rented a storage unit in Wynne, Arkansas (about two hours outside of Little Rock).  After rent for the storage unit went unpaid, the storage facility auctioned off the contents of the unit, which included the pop-up trailer.  B&D Transport (B&D) purchased the trailer at auction.  On February 18, 2002, a B&D representative contacted police after he found Montana's remains while emptying the contents of a plastic container that had been in the trailer into a dumpster.  Montana's hand was visible in the dumpster; her head and face were 'completely encas[ed]' in several layers of duct tape.

"The chief medical examiner at the Arkansas State Crime Laboratory performed an autopsy on Montana.  Her body was mostly decomposed, which limited the ability to observe soft tissue injuries.  However, the autopsy revealed Montana suffered linear fractures through the entire thickness of both parietal bones of her skull (the bony plates on the top and sides of the skull).  The fractures were caused by 'severe blunt force.'  Because both parietal bones were broken, '[e]ither something struck [her] head on one side and then the other, or [she] was swung [such that her head impacted a hard surface] twice . . . .'  The skull fractures showed no signs of healing.

"Montana's left tibia was also fractured into two pieces.  According to Dr. Kokes, this fracture was caused by bending or twisting the leg 'in a manner similar [to] if you wanted to break a pencil.'  There was evidence of healing, which indicated the fracture was inflicted three to four weeks before Montana's death (when she was about six weeks old).  External symptoms of this fracture (swelling and redness) would have been 'obvious' to the naked

9

eye, and it 'inevitably' would have caused pain that resulted in 'excessive' crying or fussiness.

"Montana's lower left leg, near the ankle, exhibited periosteal thickening, indicating trauma short of a fracture. This condition would have been very painful, and could have caused swelling and redness.

"Dr. Sturner consulted a forensic anthropologist to help determine Montana's age at the time of death. Their conclusion was consistent with the parties' stipulation that Montana was approximately 10 weeks old when she died.

"Dr. Kokes concluded the cause of Montana's death was 'homicidal violence by undetermined means.' He identified three possible mechanisms of death: blunt force trauma to the head; blunt force trauma to the head, followed by wrapping with duct tape to ensure death by suffocation; and suffocation with duct tape, with the skull fractures being inflicted after death. Dr. Kokes opined the most likely mechanism was blunt force trauma to the head; the duct tape was likely used 'to contain any blood or fluid or oozing that might have been taking place at that time, because there's no other reason to do that.'

"Inside the abandoned pop-up trailer, police found photographs of [Werntz] and maps of several other states. They traced the trailer's New Hampshire license plate to Hann. Police sought arrest warrants for [Werntz] and Hann, whom police suspected were no longer in Arkansas. The police contacted the owners of a nationwide motel chain, which issued a be-on-the lookout for [Werntz] and Hann. As a result, on April 22, 2002, police in Portland, Maine responded to a call informing them that [Werntz] and Hann were staying at a motel there. While police were formulating a plan to get the suspects in custody without incident, [Werntz] 'ran into the police' as she

10

approached a vending machine in the lobby.  Police arrested her without incident.  In an effort to get Hann out of the room, the motel clerk called him and told him [Werntz] had twisted her ankle and they were going to call for medical help.  Hann replied, ' "No, no, no.  Don't do that.  I'll be right down and take care of it myself." '  When Hann exited his motel room holding one-month-old Michael, police took Michael and arrested Hann.

"*Michael*

"Police contacted the Maine Human Services Department, who placed Michael in the foster home of Jan R. within 12 to 15 hours of Hann's arrest.  The first day of that placement, Jan observed Michael did not appear healthy—he was 'flaccid'; he did not flail his arms or wiggle his feet; he did not cry loudly, but rather, mewed like a kitten; his eyes did not track objects well; and he appeared too thin.  She based her observations on her experience raising two now-adult biological children, not on her experience as an adoptive or foster parent.  Jan did not observe any physical injuries such as bruising or swelling.  She immediately took Michael to a doctor.

"Michael was admitted to the hospital on April 24, 2002.  Staff noted he was lethargic, had poor tone, was not tracking well with his eyes, and appeared to be in pain upon movement.  He had no external signs of trauma, no bruises, and no obvious injuries.  However, X-rays revealed that Michael had 13 rib fractures.  Evidence of healing suggested the fractures were one to two weeks old.  Four bones in Michael's legs were also fractured near both knees and one ankle.

"CT and MRI scans of Michael's head showed bleeding on the surface of the brain; subdural hematomas in various locations of at least two different ages (some days old, others a week or two old); bleeding into the brain tissue; and bruising of the brain itself.  An ophthalmologist observed extensive

11

hemorrhaging in multiple layers of Michael's retinas. A certified child abuse pediatrician opined these injuries were caused by violent shaking on more than one occasion. He further opined these types of injuries would not have been observable if Michael's body had decomposed.

*"[Werntz]'s Statement to Portland Police*

"Three days after her arrest, and after waiving her *Miranda*[5] rights, [Werntz] spoke to Portland, Maine police officer Karl Rybeck about baby Michael. She told Rybeck that Michael had been born in West Virginia four weeks earlier. Neither [Werntz] nor Hann had worked since. When Michael cried, [Werntz] would hold him, walk with him, and try to rock him; sometimes [Werntz] and Hann put Michael in a crib in the bathtub so they could close the bathroom door. Hann would turn the TV volume louder when he got mad at Michael for crying. [Werntz] stated she was Michael's primary caregiver when he cried. She claimed she never saw Hann harm or shake the baby, and denied doing so herself. With the exception of leaving to get meals or to go shopping, [Werntz] said she, Hann, and Michael were always together. When confronted with Michael's injuries, [Werntz] got emotional, acted 'dumbfounded,' and claimed she was unaware he had been hurt.

*"Riverside County Sheriff's Investigation and Interview of [Werntz]*

"In November 2004, the Riverside County Sheriff's Office was informed that Montana, whose remains were found in Arkansas, may have died in Riverside County in February 2001. Sergeant Gary LeClair reviewed police reports from Arkansas, Maine, Vermont, and Arizona, and searched for records establishing that [Werntz] and Hann had lived in Riverside County during the relevant period. Sergeant LeClair obtained documents from a temporary employment agency showing [Werntz] worked out of a Riverside

5    "*Miranda v. Arizona* (1966) 384 U.S. 436."

12

County branch from January 31, 2001, through April 2001. The documents showed that [Werntz] and Hann then moved throughout the country, returning to California in October and November 2001. Records showed [Werntz] and Hann lived in a trailer park on the outskirts of Desert Hot Springs in Riverside County.

"On March 1, 2005, Sergeant LeClair interviewed [Werntz] about Montana's death. [Werntz] stated she met Hann when she was 18 years old. Once they met, they were 'unseparated.' About one month after Montana was born in Arizona, they moved to a trailer park in California, where they all lived together in a 30-foot by 12-foot trailer. Once they left Arizona, Montana received no medical treatment. In the trailer, Montana usually slept in bed with [Werntz] or Hann; sometimes she slept in the bathtub when she would not stop crying. Both parents fed Montana, but [Werntz] often woke up at night to feed her. Hann changed the baby most of the time; [Werntz] sometimes did. [Werntz] stated that when she was not working she spent a lot of time with Montana. [Werntz] claimed Montana was never injured before her death.

"According to [Werntz], Montana died in the trailer on February 10, 2001. After working that morning at a woman's house in Palm Springs, [Werntz] returned to the trailer park and was greeted by Hann outside the trailer saying, ' "I have to tell you something." ' [Werntz] entered the trailer and picked up Montana, who was laying in the bathtub. Sergeant LeClair asked [Werntz], ' "What was Montana's condition when you picked her up?" ' [Werntz] responded, ' "She was fine." ' Sergeant LeClair asked [Werntz], ' "Was she alive?" ' [Werntz] responded, ' "No, she wasn't alive." '

"[Werntz] stated that Montana was wrapped in a blanket and felt cold. [Werntz] did not unwrap her. [Werntz] did not call 911 or seek assistance

13

from anyone; nor had Hann, a point on which [Werntz] did not press him. After sitting on the toilet holding Montana for a while, [Werntz] left the trailer with Hann to stay at a motel, leaving Montana behind in the bathtub because [Werntz] 'didn't want to deal with it.'

"[Werntz] told Sergeant LeClair that Hann claimed he had put Montana in the bathtub with a bottle of milk and cereal, then left the trailer. When he went back inside, Montana was dead and had 'puke' around her mouth and face. [Werntz] acknowledged she did not see any vomit on the baby.

"When Sergeant LeClair asked [Werntz] about the fact Montana died under similar circumstances to Jason, [Werntz] said that nobody had shown her Montana's autopsy results, claiming ' "No one's ever told me anything." ' She also stated she ' "thought maybe" ' Jason had died from a spider bite while they were living in a tent in Vermont. She admitted she never examined Jason for evidence of a spider bite, and never called authorities following his death. Instead, [Werntz] and Hann kept his remains in a plastic container in the back seat of their car as they drove around the country. They left Jason in a trailer at a storage facility in Arizona before moving to California.

"[Werntz] put Montana's dead body in a bag so they could '[k]eep her longer,' and kept it in a storage compartment under their bed in the trailer 'so [she] can stay with them and she could sleep.'

"[Werntz] told Sergeant LeClair that Michael was born [i]n March . . . 2002. She claimed Michael was in good health and had no injuries. [Werntz], Hann, and Michael were together all the time, other than when [Werntz] ran errands. No one other than [Werntz] and Hann cared for

14

him. [Werntz] claimed Hann was a good father, and she never saw him get violent with her children."

After reading those facts into the record, the trial court turned to another portion of our opinion in *People v. Werntz, supra*, D069075, "because it [summed] up, quite well, [the trial court's] impressions of this case." The trial court noted that although we reviewed the facts "in the light most beneficial to the conviction," it "read[ ] these facts not that way" but instead "adopting them . . . as [its] analysis of this case, and the implied malice therein." The court then explained that "[t]he following evidence supports . . . an overwhelming inference that [Werntz] was aware that Jason was murdered." To this end, the court noted Werntz "never informed authorities of [Jason's] death"; "[s]he contradicted her specious spider bite theory by confirming Hann's statement to the [S. Family] that Jason died a crib death"; "she concealed Jason's remains in a plastic container in her car as they traveled the country"; and "she further concealed Jason's remains by leaving them in a trailer she abandoned at a storage facility in Arizona."

The court also observed several similarities between Werntz's response to Jason's death and her response to Montana's death. Therefore, the court noted Werntz (1) "never informed authorities of Montana's death"; (2) "concealed [Montana's] remains in a plastic container in her trailer as they traveled the country"; and (3) "further concealed Montana's remains by leaving them in a trailer she abandoned in a storage facility in Arkansas." The court then emphasized: "The decomposition of Jason's remains prevented a comprehensive autopsy so, too, with Montana."

The court summarized why it denied the petition as follows:

> "[Werntz] put two dead children in a box and left them. The best scenario—the best analytical model that you can opine based on the silence, because we don't really get to

15

hear from them in any detailed way, is . . . Hann was the abuser.  But even if you accept that Hann was the abuser, the notion that she was not aware of his violent nature, based on her conduct, defies logic.  This is a bone-chilling case.  This is the type of case—these facts are horror stories.  They are the substance of horror stories.

"I find overwhelming evidence supporting implied malice here.  Never have I seen a case of such callous disregard for one's own child.  Even abusers are quite often unmade by what they've done.  They breakdown into tears and quite often report on themselves.  This is one of the most bone-chilling accounts I have ever seen of a failure to protect.  And I discount, just like the spider bit notion that she didn't know, the ability of a six-week, 10-week, or four-week old child to manage their visceral response to these types of injuries just does not exist.  It just does not exist.  These children were crying.  They were in agony.

"The petition is denied.  I find that the People have met their burden by the combined force of all of the witnesses who testified, and that it has been proved to me beyond a reasonable doubt, that she failed to protect her children.  This is absolutely an implied malice murder.  And for that reason, I find her guilty.  The petition is denied."

Werntz timely filed a notice of appeal.

## DISCUSSION

### A. Senate Bill No. 1437

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 4) (Senate Bill 1437) narrowed liability for murder under the felony-murder rule and eliminated the natural and probable consequences doctrines.  (§§ 188, subd. (a)(3) & 189, subd. (e); *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1147 (*Anthony*).)

Senate Bill 1437 addressed aspects of felony murder and the natural and probable consequences doctrine, "redefin[ing] 'malice' in section 188.  Now, to be convicted of murder, a principal must act with malice

16

aforethought; malice can no longer 'be imputed to a person based solely on his or her participation in a crime.' (§ 188, subd. (a)(3).)" (*In re R.G.* (2019) 35 Cal.App.5th 141, 144.) Senate Bill 1437 also amended section 189 by adding subdivision (e), which states that a participant in the target felony who did not actually commit a killing is nonetheless liable for murder if he or she aided, abetted, or assisted the actual killer in murder or was a major participant in the target crime and acted with reckless indifference to human life. (§ 189, subd. (e)(2)-(3).) The result is that Senate Bill 1437 "ensure[s] that murder liability is not imposed on a person who is not the actual killer, did not act with intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (*Anthony*, *supra*, 32 Cal.App.5th at p. 1147.)

Section 1172.6, subdivision (c) provides: "Within 60 days after service of a petition that meets the requirements set forth in subdivision (b), the prosecutor shall file and serve a response. The petitioner may file and serve a reply within 30 days after the prosecutor's response is served. These deadlines shall be extended for good cause. After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."

When a trial court reviews a petition for resentencing, the court first determines if the petitioner has shown a prima facie case for relief under the statute. The court may deny the petition if the person is ineligible as a matter of law. (*People v. Drayton* (2020) 47 Cal.App.5th 965, 980-981.) If the

petitioner meets the prima facie burden, the court must issue an order to show cause and hold an evidentiary hearing on the petition. (§ 1172.6, subds. (c) & (d)(1); *People v. Lewis* (2021) 11 Cal.5th 952, 962.) At this stage of the proceeding, the prosecution has the burden of proving "beyond a reasonable doubt[ ] that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); *People v. Martinez* (2019) 31 Cal.App.5th 719, 723-724.)

### B. Standard of Review

Werntz asks us to review the trial court's petition denial de novo because the trial court's factual findings were based on a cold record. To support her request, Werntz primarily relies on *People v. Vivar* (2021) 11 Cal.5th 510, 524 (*Vivar*).

In *Vivar*, *supra*, 11 Cal.5th 510, the defendant filed a motion to vacate his plea-based conviction under section 1473.7, which provided relief upon a "showing, by a preponderance of the evidence, of a *prejudicial* error that affected a defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea." (*Vivar*, at p. 517; § 1473.7, subds. (a)(1), (e)(1).) The Supreme Court compared its review under section 1473.7, subdivision (a)(1) to a review of claims on habeas corpus, noting that independent review was supported by "the profound and substantial consequences of a prejudicial misadvisement on a defendant's life." (*Vivar*, at pp. 524, 525.)

The court's decision did not turn on the nature of the evidence, as Werntz proposes here. The court considered the rights at stake, explaining that the purpose of section 1473.7 was "to offer relief to those persons who suffered 'prejudicial error' but are 'no longer imprisoned or restrained' and for that reason alone are unable to pursue relief on habeas corpus." (*Vivar*,

18

*supra*, 11 Cal.5th at p. 525.)  It noted that it had adopted an independent review due to "multiple factors with special relevance here:  the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is likely to be based, and the relative competence of trial courts and appellate courts to assess that evidence."  (*Id.* at p. 527.)  Further, the court explained that "[w]hether counsel's advice regarding immigration was inadequate and whether such inadequacy prejudiced the defense, while mixed questions, are predominantly questions of law."  (*Id.* at p. 524.)

As our colleagues in the Fourth Appellate District, Division Two point out, the questions we face on a review from a court's denial of a section 1172.6 motion are primarily factual.  (*People v. Clements* (2022) 75 Cal.App.5th 276, 301 (*Clements*).)  Unlike the court in *Vivar,* we are not considering predominantly questions of law, and the factors that persuaded the court in *Vivar* to apply independent review are not at play here.

The other cases offered by Werntz are likewise inapposite.  They address situations in which jurors were dismissed for cause based solely on documentary evidence (*People v. McKinnon* (2011) 52 Cal.4th 610, 647 [questionnaire]; *People v. Thompson* (2010) 49 Cal.4th 79, 100 [questionnaire]; *People v. Avila* (2006) 38 Cal.4th 491, 529 [questionnaire]), the governor's denial of parole (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677), a habeas corpus petition (*In re Serrano* (1995) 10 Cal.4th 447, 457), and review of a referee's resolution of mixed questions of law and fact in a petition for habeas corpus (*In re Cudjo* (1999) 20 Cal.4th 673, 688).  None of these situations is akin to resentencing.

Further, in the context of Proposition 36, which narrowed the class of third-strike felonies for which an indeterminate sentence can be imposed and

19

permits inmates convicted of nonserious, nonviolent felonies under the Three Strike law to petition for resentencing (§ 1170.126, subd. (f)), our Supreme Court has held the substantial evidence standard of review applies. (*People v. Perez* (2018) 4 Cal.5th 1055, 1066.) The court noted that "even if the trial court is bound by and relies solely on the record of conviction to determine eligibility, [where] the question . . . remains a question of fact . . . we see no reason to withhold the deference generally afforded to such findings." (*Ibid*.) Thus, like the court in *Clements,* we conclude the proper standard of review is substantial evidence. (See *Clements*, *supra*, 75 Cal.App.5th at p. 301; accord *People v. Garrison* (2021) 73 Cal.App.5th 735, 747; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 984; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087; *People v. Gregerson* (2011) 202 Cal.App.4th 306, 320 [review of trial court's fact finding for substantial evidence].)

When we conduct a review for sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment below. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.) We look for substantial evidence, which is evidence that is "reasonable, credible and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078; *People v. Banks* (2015) 61 Cal.4th 788, 804), and we do not substitute our own factual determinations for the factfinder's (*Koontz*, at p. 1078).

### C. Whether Aiding and Abetting Implied Malice Murder Remains a Valid Legal Theory

The trial court found that the prosecution had proved beyond a reasonable doubt that Werntz was guilty of implied malice murder by failing to protect her child. The prosecution argues the court concluded that Werntz was a direct aider and abettor of Hann in the death of Montana. Although Werntz challenges whether substantial evidence supports the court's

conclusion, she offers a more fundamental challenge to the court's determination. Thus, as a threshold matter, Werntz contends there can be no implied malice murder under a direct aiding and abetting theory "because the specific intent principles of accomplice liability are incompatible with implied malice murder, which requires no intent to commit the ultimate crime and no intent to kill."

Further, Werntz advances her argument while acknowledging that California "courts have unanimously held that one can be liable for murder as an aider and abettor if they harbor implied malice." (See *People v. Langi* (2022) 73 Cal.App.5th 972, 982-983 (*Langi*); *People v. Powell* (2021) 63 Cal.App.5th 689, 711-713 (*Powell*).) Indeed, in *People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 499 (*Valenzuela*), this court rejected a similar argument to the one Werntz makes here.

In *Valenzuela*, *supra*, 73 Cal.App.5th at page 499, the defendant argued that the changes in the law prohibiting aiding and abetting liability under the natural and probable consequences doctrine (see § 1172.6, subd. (a)) also precluded conviction on an implied malice theory. We disagreed, explicitly agreeing with the analysis in *Powell* and reading *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*) as providing "that an aider and abettor who acts with

implied malice can be guilty of murder entirely apart from the natural and probable consequences doctrine."[6] (*Valenzuela*, at p. 499.) We expounded:

> "*Powell* carefully explains that direct aiding and abetting of an implied malice murder is based on 'the aider and abettor's *own* mens rea.' ([Citation], italics added.) Emphasizing the point, *Powell* adds that the requisite intent 'must be *personally harbored* by the direct aider and abettor' and consists of 'knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that the *act* is dangerous to human life, and acting in conscious disregard for human life.' ([Citation], first italics added.) In this key respect, *Powell* is entirely consistent with *Gentile* in basing murder liability on the aider and abettor's own state of mind—*conscious* disregard for life." (*Valenzuela*, at p. 499.)

More recently, we reaffirmed that implied malice murder is a permissible theory of murder liability. (See *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388 (*Vizcarra*).) There, like Werntz in the instant action, the defendant argued his petition for resentencing under section 1172.6 should have been granted because aiding and abetting implied malice murder is not a valid theory of murder liability. We again rejected that argument, relying on *Powell*, *Gentile*, and *Valenzuela*. (*Vizcarra*, at pp. 390-392.) In addition, we disagreed with the defendant that we should reach a different

---

6      Werntz contends we should ignore *Gentile* because its discussion of aiding and abetting implied malice murder is merely dicta. Even assuming the Supreme Court's discussion in *Gentile* was dicta, "our high court's ' "dicta generally should be followed, particularly where the comments reflect the court's considered reasoning." ' " (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 589, review granted July 27, 2022, S274792 (*Glukhoy*).) Our Supreme Court has said the very same about its dicta. (*Los Angeles v. San Pedro etc. R. R. Co.* (1920) 182 Cal. 652, 660 ["The statements in the opinions of the supreme court of this state and of the United States relating to the 'inner bay exception,' although *obiter dicta*, are very persuasive as to the meaning of the patent"].)

conclusion under Senate Bill No. 775 (Stats. 2021, ch. 551) (Senate Bill 775), which expanded the pool of eligible resentencing petitioners to include any person convicted of murder per any " 'theory under which malice is imputed to [the] person based solely on that person's participation in a crime.' " (*Vizcarra*, at p. 391; see § 1172.6, subd. (a).)  To this end, we explained:

> "Senate Bill 775 does not undermine *Valenzuela*, nor does it affect our conclusion that direct aiding and abetting implied malice murder remains a valid form of murder liability, because a person convicted of aiding and abetting implied malice murder is not a person convicted of murder pursuant to a theory under which malice is imputed based solely on the person's participation in a crime." (*Vizcarra*, at p. 391.)[7]

We further relied on *Glukhoy*, *supra*, 77 Cal.App.5th at pages 590 through 591, review granted, which we quoted:

> " '[F]or second degree murder based on implied malice, there is no imputation of malice because, as we have explained, the direct aider and abettor must have the same mental state as the actual perpetrator of the charged crime: the direct aider and abettor must act with knowledge that *the act* is dangerous to human life and with conscious disregard for human life.  Given the mens rea requirements

---

[7]     At the section 1172.6 evidentiary hearing, Werntz argued the trial court could not find her guilty under Senate Bill 775.  The court noted that Senate Bill 775 was not yet effective at the time of the hearing; thus, the court did not appear to apply the new law.  However, at the end of the hearing, Werntz asked the court to specifically discuss Senate Bill 775, and the court concluded that the new law did not apply to the type of murder involved in the instant action.  The court further observed that the theory of second degree murder advanced here "is not a specific intent to kill, but . . . acting with a knowing and conscious disregard for the safety of others.  And as the People correctly cited in their brief, that also an act can be an omission for one who is legally obligated to act. . . .  I think we have implied malice by failure to act."  We agree that Senate Bill 775 does not alter our analysis here. (See *Vizcarra*, *supra*, 84 Cal.App.5th at p. 391.)

for aiding and abetting implied malice, not only is malice not 'imputed' on this direct aiding and abetting theory, but liability is not grounded 'solely' upon participation in the crime. . . . Liability for murder is grounded upon the requirement that the aider and abettor personally harbor malice.' " (*Vizcarra*, *supra*, 84 Cal.App.5th at p. 391.)

We therefore "join[ed] the chorus of appellate authorities—from the Supreme Court, our own court, and other Courts of Appeal—which have uniformly upheld aiding and abetting implied malice murder as a viable form of murder liability, notwithstanding the legislative changes effectuated by Senate Bill 1437 and Senate Bill 775." (*Vizcarra*, *supra*, 84 Cal.App.5th at p. 391.)[8]

Werntz also argues that the conclusion that aiding and abetting implied malice murder is a valid theory under current California law is inconsistent with *People v. Swain* (1996) 12 Cal.4th 593. There, our high court determined that an intent to kill, and not merely implied malice, is a required element for the crime of conspiracy to commit murder. (*Id.* at pp. 596, 602-603.) It reasoned that it "would be illogical to conclude one can be found guilty of conspiring to commit murder where the requisite element of malice is implied," because a conspiracy to commit murder is a crime before any murder but implied malice is only determined after the murder "in part through hindsight." (*Id.* at p. 603, italics omitted.) Werntz argues the

---

8      (See *Gentile*, *supra*, 10 Cal.5th at p. 850; *Glukhoy*, *supra*, 77 Cal.App.5th at pp. 589-591, review granted; *Valenzuela*, *supra*, 73 Cal.App.5th at p. 499; *Powell*, *supra*, 63 Cal.App.5th at pp. 706-714; *Langi*, *supra*, 73 Cal.App.5th at p. 983 [citing approvingly to the mens rea standard articulated in *Powell*]; *People v. Cortes* (2022) 75 Cal.App.5th 198, 205 ["the evidence presented and arguments made might support that [the defendant] aided and abetted a shooting and acted with *implied* malice—a theory of murder that is still valid"].)

same logic applies here, but unlike the crime of conspiracy to commit murder, aiding and abetting a murder is not an inchoate crime that is complete before the murder occurs. No one, after all, could be found guilty of aiding and abetting a murder that has yet to occur. (See *Gentile, supra,* 10 Cal.5th at p. 843 ["Aiding and abetting is . . . a form of derivative liability for the underlying crime"].) As such, the "illogic[ ]" at the heart of the *Swain* court's reasoning has no application here.

In the instant matter, Werntz has provided no compelling argument persuading us to revisit our conclusions in *Vizcarra* and *Valenzuela*. Accordingly, we again, consistent with other published opinions on this topic, conclude that aiding and abetting implied malice murder is a permissible theory of murder liability.

## D. Substantial Evidence

We next turn to Werntz's argument that the court's finding that she was guilty of second degree murder for failing to protect her child is not supported by substantial evidence. Murder is an unlawful killing of a human being committed with malice aforethought. (§ 187, subd. (a); *People v. Knoller* (2007) 41 Cal.4th 139, 151; *People v. Blakeley* (2000) 23 Cal.4th 82, 87.) Second degree murder "is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*Knoller*, at p. 151.) Malice may be express or implied. Malice is express when a person has the intent to kill. (*People v. Robertson* (2004) 34 Cal.4th 156, 164.) "Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the

25

danger to life that the act poses.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 941-942.)

Here, Werntz argues that because the trial court did not specifically reference aiding and abetting in explaining its findings, it "presumably determined that Werntz was guilty as a direct perpetrator." However, we find scant support for that conclusion in the record. In its written opposition to Werntz's petition for resentencing, the prosecution only argued that Werntz was guilty as a direct aider and abettor for failing to protect Montana from Hann. The prosecution did not argue Werntz was a direct perpetrator. Further, the court seemed to agree, suggesting that the "best analytical model" points to "Hann [ ]as the abuser." The court then stated that even if Hann was the abuser, it was not credible that Werntz "was not aware of his violent nature." Thus, the court did not find that Werntz was the abuser but rather, that she failed to protect Montana from Hann. In other words, the court determined that Werntz was guilty of implied malice murder as a direct aider and abettor.

Indeed, it appears the failure to act in the instant action is analogous to the failure to act discussed in *People v. Rolon* (2008) 160 Cal.App.4th 1206 (*Rolon*). There, the appellate court explained:

> "We are satisfied that the better rule is that parents have a common law duty to protect their children and may be held criminally liable for failing to do so: a parent who knowingly fails to take reasonable steps to stop an attack on his or her child may be criminally liable for the attack if the purpose of nonintervention is to aid and abet the attack." (*Id.* at p. 1219.)

The court therefore concluded "that aiding and abetting liability can be premised on a parent's failure to fulfill his or her common law duty to protect his or her child from attack. For the same reasons we conclude that such

26

intentional conduct in support of an aider and abettor can support liability for implied malice murder." (*Ibid*.)

Here, the trial court implicitly followed *Rolon* and agreed with the prosecution that Werntz was guilty of implied malice murder as a direct aider and abettor for failing to protect Montana. To this end, the court determined that Werntz was aware of Hann's violent tendencies and abuse of Montana but did nothing to protect her daughter. We therefore evaluate whether substantial evidence supports that conclusion.

"A person who aids and abets the commission of a crime is culpable as a principal in that crime." (*Gentile, supra*, 10 Cal.5th at p. 843; see *Powell, supra*, 63 Cal.App.5th at p. 710.) "[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*Gentile*, at p. 843.) Thus, a direct aider and abettor's guilt is " 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*Powell*, at p. 710; see *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

Implied malice has " 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." ' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*).) Thus, to be culpable as a direct aider and abettor of implied malice murder, the accomplice " 'must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.' " (*Valenzuela, supra*, 73 Cal.App.5th at p. 501; accord, *Powell, supra*, 63 Cal.App.5th at p. 713.)

27

Passive conduct or omissions may satisfy the actus reus component of murder where the person is under a duty to act.  (See *People v. Protopappas* (1988) 201 Cal.App.3d 152, 168; *People v. Burden* (1977) 72 Cal.App.3d 603, 620-621.)  And the failure to perform an act that one has a legal duty to perform is legally equivalent to performance of an act.  (*People v. Heitzman* (1994) 9 Cal.4th 189, 197-198 [those who have a legal duty to act are criminally liable for failure to fulfill legal duty to act]; *People v. Ogg* (2013) 219 Cal.App.4th 173, 181 [knowledge of sexual abuse and failure to prevent it]; *Rolon*, *supra*, 160 Cal.App.4th at p. 1219 [defendant liable for murder where she knew of her boyfriend's physical abuse of child and failed to prevent it]; *People v. Latham* (2012) 203 Cal.App.4th 319, 327 [failure of parents to obtain needed medical care for child made them liable for second degree murder]; *Burden*, at pp. 616-618 [father failed in his duty to feed his child].)  Here, Werntz, as Montana's mother, had a duty to protect her daughter.  It is undisputed that she did not do so.  She did not seek medical care for Montana.  Nor did she prohibit Hann from interacting with or otherwise spending time with Montana.  Thus, we conclude that the physical component of implied malice is supported by substantial evidence (overwhelmingly so).  Accordingly, we move on to the mental component.

The mental component of implied malice murder requires that the defendant " ' "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' " (*Chun*, *supra*, 45 Cal.4th at p. 1181.)  " '[T]he aider and abettor of implied malice murder need not intend the commission of *the crime* of murder.  Rather . . . he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life.' "

28

(*Valenzuela, supra*, 73 Cal.App.5th at p. 501; accord, *Powell, supra*, 63 Cal.App.5th at p. 714.) "The requisite intent is a subjective one—the defendant must have '*actually appreciated* the risk involved.'" (*Valenzuela*, at p. 501.) "'In short, implied malice [murder] requires a defendant's awareness of engaging in conduct that endangers the life of another.'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507; accord, *People v. Palomar* (2020) 44 Cal.App.5th 969, 974.) Moreover, like all other elements of a crime, implied malice may be proven by circumstantial evidence, and the "'very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act.'" (*Valenzuela*, at p. 502.)

Here, Werntz contends there is no "solid, credible evidence" that, "by her inaction, and with implied malice, [she] intended to aid Hann's crime." To this end, she argues substantial evidence does not support the conclusion that she was aware that Hann was abusing Montana, that Montana needed medical treatment, or that Montana was in danger while in Hann's presence. We disagree.

There was ample evidence from which the trial court could reasonably infer that Werntz knew that her inaction endangered Montana in conscious disregard of her young life, especially in leaving Montana to Hann's care. Werntz's first child, Jason, was a victim of homicide. Jason's rib was fractured in an unusual location, adjacent to his spinal column, consistent with being inflicted by intentional trauma. Yet, despite the trauma her own son experienced resulting in his death, Werntz offered differing, more natural possible causes for his death- a spider bite or crib death. After Jason's death, Werntz concealed Jason's body, for a lengthy time, in a plastic container during Werntz and Hann's travels, then abandoned the body in an Arizona

29

storage facility. Werntz's actions precluded authorities from determining the full extent of the injuries inflicted upon the child.

Despite her first child having died by brutal means, Werntz had a second child, Montana, about a week before she abandoned Jason's corpse in Arizona. Even crediting Werntz's explanation that she was at work when Hann killed Montana, her inaction and failure to provide medical treatment for Montana demonstrated a consciousness disregard for her life.

Substantial evidence established that Montana, who was only two months old when she was killed, had suffered a fracture to her left lower leg and an ankle injury. Her tibia was completely broken into two pieces as if snapped like a pencil. The injury to Montana's leg had occurred three to four weeks before her death. Montana's broken leg would have been noticeable and "obvious" to Werntz, who admitted she fed and changed Montana and spent a lot of time with her when not at work. Werntz would have observed swelling, redness, pain and tenderness associated with the broken leg.[9]

---

[9]    On appeal, Werntz ignores this evidence, which was provided by Dr. Charles Kokes, a medical doctor specializing in anatomic and forensic pathology. Instead, Werntz points this court to the testimony of Dr. Cheryl May, an expert witness for the defense. May is not a medical doctor but has a Ph.D. in forensic anthropology. Werntz highlights portions of May's testimony where she opined that she did not see any evidence of healing in the broken leg and that she could not ascertain the severity of the ankle injury. However, Werntz does not explain why Dr. Kokes's testimony is not substantial evidence. " 'Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the [substantial evidence] standard is sufficient to uphold the finding.' " (*People v. Lucero* (2019) 41 Cal.App.5th 370, 411, quoting *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) Thus, it appears that Werntz is suggesting that the trial court, as the trier of fact, did not properly weigh the evidence, and she is asking this court to reweigh the evidence. Under a substantial evidence review, however, we do not reweigh the evidence. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Nonetheless, Werntz did not seek medical treatment for Montana. Rather, Montana lived with her injury for three to four weeks before she died from the later inflicted head injuries.

Moreover, despite knowing Montana had suffered a serious leg injury, and knowing her first child had died from intentionally inflicted trauma, Werntz took no action to call police or any other authorities, but instead, she left Montana with Hann. Following Montana's death, Werntz again did not call the police. She did not seek medical treatment notwithstanding her own admission that Montana was "fine" when she first picked her up out of the bathroom upon returning from work. To the contrary, she left Montana in the bathtub, then placed her body in a plastic bin that she concealed in her vehicle for the next eight months, preventing authorities from conducting an immediate autopsy to determine her cause of death. A reasonable factfinder could have inferred that Werntz's attempts to hide the evidence indicated her consciousness of guilt. (See *People v. Cooper* (1991) 53 Cal.3d 771, 833 [defendant disposed of shoes]; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1296 [defendant attempted to get rid of gun].) Indeed, evidence of consciousness of guilt is in turn evidence " 'of the fact of guilt itself.' " (*People v. Wong* (1973) 35 Cal.App.3d 812, 831; see *People v. Jones* (2018) 26 Cal.App.5th 420, 441 ["Evidence of a defendant's consciousness of guilt . . . is admissible to prove the crime"]; CALCRIM No. 371 [jury instruction that an effort to hide evidence may support consciousness of guilt].)

Additionally, at the time of her arrest, Werntz's one-month-old son Michael had 13 rib fractures, four broken bones in his legs, and subdural hematomas of at least two different ages in various locations on his brain. Evidence of the abuse of Jason and Michael was relevant to negate any claim of accident and demonstrated Werntz's knowledge and awareness that Hann

31

abused her children, assuming she was not present when Montana was killed.  Here, where Werntz had a legal duty to act as Montana's mother and not only failed to do so but consistently and continually allowed her daughter to remain in the presence of her abuser (Hann), the trial court could have reasonably inferred that Werntz was guilty of implied malice murder under a direct aiding and abetting theory.  (See *Powell*, *supra*, 63 Cal.App.5th at p. 713 ["to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*," but need not specifically intend "the result of that act," i.e., the victim's death].)

DISPOSITION

The order is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

DATO, J.

DO, J.

32